UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. |
| **EVANS INDUSTRIES, INC.** | **06-10370** |
| | SECTION A |
| DEBTOR | CHAPTER 11 |
| **R. PATRICK SHARP III, AS DISTRIBUTION TRUSTEE FOR THE DISTRIBUTION TRUST OF EVANS INDUSTRIES, INC.** | ADVERSARY NO. **08-1050** |
| PLAINTIFF | |
| VERSUS | |
| **GREIF INDUSTRIAL PACKAGING & SERVICES, LLC** | |
| DEFENDANT | |

## MEMORANDUM OPINION

### I. EXHIBITS ADMITTED INTO EVIDENCE

The parties stipulated to the admissibility of the exhibits attached to the Joint Stipulations and trial briefs.[1] The Court will admit into evidence pleading 23 and the exhibits to pleadings 22-24, 31-33.[2]

### II. FACTS

On April 25, 2006, Evans Industries, Inc. ("Evans") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.[3]

---

[1] Pleading 36.

[2] Pleading 33 substitutes Exhibit B to pleading 32. The Court allowed the substitution by its Order dated January 22, 2009. Pleading 34.

[3] Case no. 06-10370, pleading 1.

On October 24, 2006, Evans' Amended Plan of Reorganization ("Plan") was confirmed. Pursuant to the Plan, a trust was formed for the purpose of distributing assets ("Distribution Trust").[4] R. Patrick Sharp III was named trustee ("Trustee").[5]

On November 6, 2006 ("Closing Date"), Evans entered into an Asset Purchase Agreement ("APA") with Greif Industrial Packaging & Services, LLC ("Greif").[6] Pursuant to the Plan, the proceeds of the sale became an asset of the Distribution Trust.[7]

Under the APA and Confirmation Order, Greif was allowed to escrow $1,657,500.00 ("Holdback") from the sales price of $11,250,000, for setoff against the possibility of certain post-closing claims ("Holdback Claims").[8]

---

[4] Case no. 06-10370, pleading 502, exhibit 1, Article XI.

[5] Joint Stipulations, pleading 23, ¶ 5.

[6] Pleading 23, Exhibit A.

[7] Case no. 06-10370, pleading 502, Article XI.

[8] The APA provides:

> (ii) an amount equal to $1,657,500 shall be paid by [Greif] to an interest bearing escrow account for period not to exceed twelve (12) months subject to distributions described below, as security for Seller's obligations hereunder (the "Holdback"). Every four months from the Closing Date, if no Holdback Claims have been made, $414,375 plus any accrued interest shall be transferred by wire to the single account designated by the Official Unsecured Creditors Committee. Any balance of the Holdback less any Holdback Claims shall be transferred by wire to the single account designated by the Official Unsecured Creditors Committee within 5 Business Days of the expiry of twelve (12) months from the Closing Date. (iii) the Holdback payable on the first business day of any calendar quarter shall only be reduced or offset by the Holdback Claims asserted by [Greif] during the immediately preceding calendar quarter, and shall be subject to final determination by the Bankruptcy Court in the event that the Distribution Trustee or Unsecured Creditor's Committee disputes the amount or existence of the Holdback Claim asserted by Buyer.

Joint Stipulations, Exhibit 1, p. 5.

If Greif accrued Holdback Claims, after written notice, Greif was entitled to offset the Holdback in the amount of the claims. If the parties disagreed either as to the amount or validity of the Holdback Claims, the Bankruptcy Court retained jurisdiction to decide the issue.[9]

After the Closing Date, Greif performed an environmental cleanup of the following properties:[10]

(1) 1255 Peters Road, Harvey, LA ("1255 Peters");
(2) 2800 Peters Road, Harvey, LA ("2800 Peters");
(3) 3950 Highway 30, Saint Gabriel, LA ("St. Gabriel"); and
(4) 10521 Sheldon Road, Houston, TX ("Houston").

---

[9] Under the APA:

[Greif's] election to claim a right to set off against the Holdback, [Greif] shall give prompt written notice to [Evans] and the Official Unsecured Creditors Committee or the Distribution Trustee of the nature of the event in which [Greif] would be entitled to claim a material breach by [Evans] of a covenant or obligation under this Agreement or of Sellers representations and warranties hereunder. Such written notice shall set forth the nature of the claim and [Greif's] assessment of the value of the claim that [Greif] has or intends to withdraw from the Holdback. The Holdback payable on the first business day of any calendar quarter shall only be reduced or offset by the Holdback Claims asserted by Buyer during the immediately preceding calendar quarter, and shall be subject to final determination by the Bankruptcy Court which shall retain jurisdiction to determine the validity and viability of any Holdback Claim in the event that the Distribution Trustee or Unsecured Creditor's Committee disputes the amount or existence of the Holdback Claim asserted by [Greif].

Joint Stipulations, Exhibit 1, p. 32-33.

[10] *Id*. at ¶ 33.

All four properties were sites of operation for Evans.[11] Each was leased but, under the APA, Evans only assumed and assigned the lease over St. Gabriel to Greif.[12] The leases of 1255 Peters, 2800 Peters, and Houston were rejected under the terms of the Plan.[13] After the Closing Date, Greif independently negotiated and entered into leases over 1255 Peters and Houston.[14]

By letter dated June 26, 2007, Greif wrote Evans regarding payments made by it for Evans' payroll and property taxes; payments made to Ingersoll-Rand Financial Services ("Ingersoll-Rand"); and a June 5, 2007 letter it received from the Louisiana Department of Environmental Quality ("DEQ") regarding environmental issues associated with the 1255 Peters Road facility.[15]

By letter dated October 1, 2007, Greif transmitted invoices for costs associated with the removal of waste and hazardous materials at the St. Gabriel, Houston, 2800 and 1255 Peters Road facilities.[16]

Greif paid Ingersoll-Rand $10,452.06. The parties stipulated that "Evans' contract and liability with Ingersoll-Rand was not an asset or liability which was transferred to Greif by Evans," and "[t]he Ingersoll-Rand debt was not an assumed liability under the APA contract."[17]

---

[11] Joint Stipulations, pleading 23, ¶ 22 and 23.

[12] Under the APA, a second lease was also assigned for 1240 Grefer Street, Harvey Louisiana ("Grefer St."), but no cleanup costs were incurred on this parcel.

[13] Case no. 06-10370, pleading 502, Exhibit 1, Article VIII and Joint Stipulations, pleading 23, ¶ 24.

[14] Joint Stipulations, pleading 23, ¶ 27.

[15] Joint Stipulations, pleading 23, Exhibit B.

[16] Joint Stipulations, pleading 23, Exhibit E.

[17] *Id.* at ¶ 41-43.

4

After the Closing Date and at Greif's request, Greif replaced Evans as the named insured under Evans' "All Risk Policy"[18] underwritten by Lexington Insurance Company ("Lexington Policy").[19] As of the Closing Date, the Lexington Policy had a remaining term through May 3, 2007.[20]

The total premium for the policy was $246,210.62, of which Evans had paid $223,294.34. The pro-rata earned premium from November 5, 2006 through May 3, 2007 was 48.8%.[21] Had Evans cancelled the Lexington Policy on the Closing Date, rather than allow Greif to replace it as the named insured, Evans would have been entitled to a refund of $120,159.72.[22]

Trustee and Greif agreed that of the total Holdback, $775,750.07 was due the Distribution Trust because it was in excess of the Holdback Claims.[23] Greif paid Trustee that sum, and Trustee initiated this adversary proceeding to recover the amounts in dispute.[24]

Greif's Holdback Claims are generally described as:

(1) $649,633.75 in reimbursement for amounts expended by Greif for the removal of alleged hazardous waste, chemical and environmental cleanup and disposal costs ("Environmental claims"); and

(2) $10,452.06 in reimbursement for payments made by Greif to Ingersoll-Rand.

---

[18] The policy provided coverage for physical loss or damage and business interruption.

[19] Joint Stipulations, pleading 23, ¶ 52.

[20] *Id.* at ¶ 51.

[21] *Id.* at ¶ 53.

[22] *Id.* at ¶ 57.

[23] Case no. 06-10370, pleadings 944-945.

[24] Joint Stipulations, pleading 23, ¶ 19-21.

In addition, Trustee has asserted a setoff claim against Greif for $5,238.09 representing utility deposits posted by Evans but refunded to Greif. Greif has acquiesced to this claim.[25]

Trustee has also asserted a $97,224.12 setoff claim against Greif for prepaid insurance premiums on policies existing on the Closing Date. Greif disputes this claim.

### III. LAW AND ANALYSIS

#### A. Environmental Holdback Claims

Greif claims that the environmental costs of cleanup for 1255 and 2800 Peters, Houston, and St. Gabriel constitute Holdback Claims under the APA entitling Greif to offset them against its obligations to the Distribution Trust. Greif avers that the existence of environmental damage at Evans' former facilities breach two warranties given by Evans under the APA.

Under the APA, Evans warrantied the condition of the Acquired Assets. The leases of 1255 Peters, 2800 Peters, and Houston,[26] were rejected by Evans as a consequence of confirmation and therefore are not included as Acquired Assets transferred under the APA. It follows then that no Holdback Claim can exist as a result of the condition of the property as an Acquired Asset. As for St. Gabriel, its lease was assumed, assigned to Greif, and constituted an Acquired Asset under the APA. Its condition was, therefore, warrantied under the APA.

As part of the APA, Evans also warrantied generally that it was in compliance with environmental laws.[27] In The APA, Evans represented:

> Except as has been accurately and completely disclosed on the schedules and statement of financial affairs filed by [Evans] with the Bankruptcy Court, or Exhibit

---

[25] *Id*. at ¶ 48.

[26] Joint Stipulations, exhibit G, ¶ (iv).

[27] Joint Stipulations, exhibit 1, section 5.11.1.

6

Y, [Evans]...(ii) has complied with and is not in conflict with, or in default or violation of any ...., to the Knowledge of Seller, any statute, code, ordinance, law, rule, regulation, or published policies and guidelines of any Governmental Entity...[28]

Except as has been accurately and completely disclosed on the schedules and statement of financial affairs filed by [Evans] with the Bankruptcy Court, or Exhibit Y or [Greif's] Phase II Environmental Report or any other environmental survey, assessment, evaluation, study, report or the like, conducted by or on behalf of [Greif]("Buyer Enviromental Report")...the operations of [Evans] have been, and are in compliance with all Legal Requirements applicable to [Evans] and its operations, properties or assets relating to the environment, natural resources or the protection thereof, which compliance includes the possession of all permits under such applicable Legal Requirements, including without limitation, any applicable provisions of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601 et seq., the Hazardous Material Transportation Act, 49 U.S.C.§ 5101 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., the Clean Water Act, 33 U.S.C. §1251 et seq., the Clean Air Act, 42 U.S.C. §7401 et seq., the Toxic Substances Control Act, 15 U.S.C. §2601 et seq., the Federal Insecticide, Fungicide, and Rodenticide Act. 7 U.S.C. §136 et seq., and the Oil Pollution Act of 1990, 33 U.S.C. §2701 et seq., and the regulations promulgated pursuant thereto, and all analogous state or local statutes ...("Environmental Laws")[29]

Except as has been accurately and completely disclosed on the schedules and statement of financial affairs filed by [Evans] with the Bankruptcy Court, or Exhibit Y or any Buyer Environmental Report, [Evans], has not received any written notice from any Governmental Entity or third party alleging or concerning any material violation of, or responsibility or liability under, any Environmental Law or permit issued thereunder. Except as has been accurately and completely disclosed on the schedules and statements of financial affairs filed by [Evans] with the Bankruptcy Court, or Exhibit Y or any Buyer Environmental Report neither [Evans] nor, to the Knowledge of [Evans] any Person for whose conduct it is or may be held responsible is subject to any liability or obligation (accrued, contingent or otherwise), including the obligation, liability or commitment to clean up, correct, abate or to take any response, remedial or corrective action under or pursuant to any Environmental Laws. ... [30]

Due to the nature of [Evans'] business, [Greif] acknowledges, there are Hazardous Materials, including but not limited to those listed on Exhibit Z hereto present on or

---

[28] *Id.* at section 5.7.1

[29] *Id.* at section 5.11.1

[30] *Id*. at section 5.11.2.

7

in the environment at any properties owned, leased or occupied by [Evans] including any Hazardous Materials contained in barrels, above ground or underground storage tanks, landfills, dumps, equipment or other containers, either temporary or permanent, or otherwise .....Except as has been accurately and completely disclosed on the schedules and statement of financial affairs filed by [Evans] with the Bankruptcy Court, or Exhibit Y or any Buyer Environmental Report, (I) Hazardous Material stored on any properties leased or occupied by [Evans] are stored in accordance with applicable Environmental Laws, ...[31]

These warranties would apply to all facilities operated by Evans, whether acquired by Greif or not. Greif acknowledged in the APA that Hazardous Materials were stored at the properties,[32] and Evans warrantied that except as disclosed, all Hazardous Materials were properly stored and Evans was not in violation of any Environmental Laws. However, the APA also provides:

> ***Notwithstanding anything in this Agreement to the contrary*** and except for the Assumed Liabilities, [Evans] ***shall, without any responsibility or liability of, or recourse to [Greif]*** or any of its directors, shareholders, officers, managers, employees, agents, consultants, representatives, affiliates, successors or assigns or persons in similar positions, absolutely and irrevocably ***retain any and all liabilities and obligations of any kind or nature***, whether foreseen or unforeseen, known or unknown, existing or which may arise in the future, fixed or contingent, matured or unmatured of [Evans], ***arising out of or calculated with reference to ownership, use or possession or the transfer of the Acquired Assets, or the operation or conduct of the Business***, prior to or on the Closing date (the "Excluded Liabilities"). The Excluded Liabilities shall ***include, but not be limited to***: ...
>
> 2.3.13 ***All environmental liabilities*** resulting from or arising out of the ownership or operation of the Business, obligations under the Real Property Leases, the condition of the Acquired Assets or an environmental claim that a release occurred, in each case on or prior to the Closing Date [emphasis supplied]...[33]

Accordingly, the Court finds that the existence of environmental damages does not give Greif a Holdback Claim against Evans because, under the APA, Greif specifically released Evans from any

---

[31] *Id.* at section 5.11.4

[32] *Id.*

[33] Joint Stipulations, exhibit 1, p. 7-8.

responsibility to it for environmental liabilities associated with either the condition of the Acquired Assets, Evans ownership or operation of its business, or the real property leases.

### B. Evans' Environmental Obligations under the APA or Plan

Greif also argues that because, under the APA, Evans retained responsibility for environmental liabilities arising out of the ownership, possession or transfer of the Acquired Assets or the operation of the Business,[34] Evans is liable for the costs of cleanup. Greif avers that Evans' retention of environmental liabilities, coupled with its obligations to the landlords under its rejected or assigned leases, makes Evan's responsible for the costs of environmental cleanup.

Although under the APA Evans clearly retained all environmental liabilities associated with the 1255 Peters and Houston properties, as well as the Acquired Assets, the APA contains no requirement that Evans satisfy the retained obligations. In fact, the APA specifically acknowledges that Evans has no responsibility, nor does Greif have recourse against Evans, for retained environmental liabilities. Greif has failed to articulate any provision of the APA to refute this interpretation.

The retained liabilities are for environmental claims caused by Evans' conduct *prior* to the Closing Date.[35] Because the leases associated with these properties were rejected at confirmation, any claims due the landlords were claims arising in the bankruptcy case.[36] The payment of claims against the Evans' bankruptcy estate are governed by the Plan. Nothing in the Plan calls for peculiar

---

[34] In the APA, "the Business" is defined as "(I) the manufacturing of steel drums; and (ii) filling industrial containers with products and the related services of warehousing and distributing the filled containers." *Id*. at p. 1.

[35] Joint Stipulations, pleading 23, ¶ 36-39. Greif acquired possession of and operated the Houston, St. Gabriel, 1255 and 2800 Peters Road facilities from November 6, 2006.

[36] Case no. 06-10370, pleading. 502, exhibit A, section 8.2.

or special treatment of these claims. Instead, the Plan's provisions regarding the satisfaction of unsecured and administrative claims controls.

Under the terms of the Plan, holders of lease rejection claims had forty-five days after confirmation to file a request for payment.[37] Both landlords received notice of the Plan and its terms prior to confirmation, and both were noticed of the bar date. Neither landlord filed a claim for environmental damages under the leases although both filed claims for other damages.[38] As a result, any prepetition claim they might possess for environmental damages is now time barred.[39]

Similarly, neither landlord filed a request for recognition of an administrative claim.[40] Under the Plan, a request for an administrative claim arising out of a rejected lease had to be filed and served on Evans "no later than forty-five (45) days after the Confirmation Date."[41] Since none of the landlords asserted any administrative request based on environmental damage, any potential claims are now time barred.

The consequence of the landlords' failure to assert any claim against Evans for environmental damage is that if any do exist, they are now barred by the discharge injunction granted at confirmation. Greif, as a potential assignee or subrogee of the landlords, is also barred

---

[37] Case no. 06-10370, pleading 338, exhibit A, section 8.4.

[38] Proof of claim numbers 87-2 and 190-1.

[39] The proof of claim bar date was July 5, 2006, for non-governmental entities and September 4, 2006, for governmental entities. Case no. 06-10370, pleading no. 27. The affected landlords were given notice of the Plan and its terms. Case no. 06-10370, pleading 513. The landlords of 1255 Peters and Houston were AFG Investment Fund 2, LLC, Scobar Adventures, LLC, and HW Burbank, LLC. The landlord of 2800 Peters was Hero Harvey Investments, LLC.

[40] Asset Funding Group (AFG") did file an administrative claim for insurance proceeds and other charges. That claim was unrelated to any environmental damage.

[41] *Id*. at section 8.4.

from asserting these claims.[42]

### C. Evans' Environmental Obligations under Environmental Statutes

Greif also alleges that Evans owes a duty under relevant state and federal environmental statutes to cleanup the referenced properties. According to Greif's argument, that duty translates to a right of reimbursement in favor of Greif because it performed Evans' obligation of cleanup. Except for citing various environmental statutes and a DEQ letter referencing issues associated with 1255 Peters, Greif has failed to articulate a legal duty owed by Evans to it.

On June 5, 2007, DEQ sent Evans a letter referencing a November 3, 2006, inspection of 1255 Peters. The letter stated, "We strongly encourage you to review the findings of our most recent inspection and immediately take any and all steps to ensure compliance with all environmental regulations at your facility."[43] The letter continues, "All violations at your facility will be taken into consideration in determining what further actions this office will take." Referral to a letter alleging unspecified violations by the DEQ is insufficient to support Greif's claims that environmental violations existed at 1255 Peters, much less any property not referenced by the letter. The Court concludes that Greif failed to prove that any "violations" existed on the properties. Greif has also failed to show that any of the costs of cleanup were a result of governmental order or action.[44]

### D. Unjust Enrichment

Finally, Greif asserts that Evans will be unjustly enriched should Greif be forced to bear the

---

[42] *Institute of London Underwriters v. First Horizon Ins. Co.*, 972 F.2d 125, 127 (5th Cir. 1992).

[43] Pleading 22, Greif's Trial Brief, Exhibit K.

[44] Joint Stipulations, exhibit 1, p. 17-18.

costs of cleanup for 1255 Peters, 2800 Peters, St. Gabriel, and Houston. Louisiana Civil Code article 2298 specifies in pertinent part:

> A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule. ..

As set forth above, the parties agreed that certain defined claims would entitle Greif to an offset against the purchase price. Environmental claims were not among those identified for offset nor was Greif given recourse against Evans for these claims. Greif now complains that to enforce the terms of the APA would unjustly enrich Evans.

Both parties to the APA are sophisticated. As of the Closing Date, both parties were aware that Hazardous Materials were produced, handled, and stored as a part of Evans' normal business operations. Greif inspected Evans' facilities prior to sale and conducted Environmental Surveys on its facilities.

The parties provided in their contract that Evans would have no responsibility to Greif, and Greif would have no recourse against Evans for the retained environmental liabilities. The language is plain and unambiguous and the parties dealt with each other at arm's length. While Greif could have insisted on a different outcome, it did not. Instead, it specifically waived any claims against Evans for these obligations. "Parties are free to contract for any object that is lawful, possible, and determined or determinable."[45] Under these circumstances, the Court finds that Greif cannot utilize

---

[45] La.C.C.Article 1971

the theory of unjust enrichment to relieve itself of the consequences of its waiver of responsibility in favor of Evans.

### E. Ingersoll-Rand Claim

Greif claims a $10,452.06 offset against the Holdback for payments made to Ingersoll-Rand. The parties stipulated that "Evans' contract and liability with Ingersoll-Rand was not an asset or liability which was transferred to Greif by Evans," and "[t]he Ingersoll-Rand debt was not an assumed liability under the APA contract." Clearly, the payments made by Greif to Ingersoll-Rand do not fall within the APA's definition of "Holdback Claim" as these payments would not entitle Greif "to claim a material breach by [Evans] of a covenant or obligation under [the APA] or of [Evans] representations and warranties."[46]

A review of the notices given in the case reveals that Ingersoll-Rand was listed on Evans' original mailing matrix. However, by Order dated April 27, 2006, the Court allowed Evans to provide limited notice to its creditors and Ingersoll-Rand was removed.[47] The Motion to Limit Notice was served on "Citicapital fka Ingersoll Rand,"[48] and the Order Setting Bar Date was served on "Citicapital (formerly Ingersoll Rand)."[49] Citicapital did not file a proof of claim.

---

[46] Under section 1.1 of the APA, Evans warrantied that all Acquired Assets were free and clear of liens and encumbrances. Also, the Confirmation Order provides that the sale is free and clear of liens and encumbrances. 06-10370, pleading 502, p. 13.

[47] Case no. 06-10370, pleading 22. As far as the Court has been able to discern, the only pleading with which Ingersoll-Rand was served was the notice that Evans' Plan was confirmed. *Id*. at pleading 513.

[48] Case no. 06-10370, pleading 6.

[49] *Id*. at pleading 69.

13

The Court confirmed the Plan without a provision for treatment of a secured claim by Ingersoll-Rand. The Confirmation Order provided that all Acquired Assets were to be transferred free and clear of all liens and encumbrances.[50] No motion has been filed to amend the Plan or to recognize the claim of Ingersoll-Rand. No evidence has been provided to establish that a debt is owed by Evans to Ingersoll-Rand or that Ingersoll-Rand had any claim to the Acquired Assets. Similarly, there is no proof that Evans benefitted by Greif's payments to Ingersoll-Rand. In short, Greif has failed to meet its burden of proof that 1) Evans owed Ingersoll-Rand any debt; 2) Ingersoll-Rand held any claim, secured or unsecured against Evans; 3) Evans was unjustly enriched by Greif's payments; or 4) Ingersoll-Rand was not bound by the terms of the Order Setting Bar Date, Plan, or Confirmation Order. As a result, Greif may not offset the amounts paid to Ingersoll-Rand against the Holdback.

### F. Insurance Premiums

Greif alleges that the Lexington Policy was transferred as part of the APA, and it owes no further amounts to Evans. All of Evans' assets, other than those that were specifically excluded, were transferred by the APA. Although the APA provided that "[p]repaid insurance deposits" were excluded assets,[51] Greif maintains that prepaid insurance premiums were not excluded because they were not deposits. Evans counters that the Lexington Policy was not transferred as part of the APA, and therefore Greif should reimburse Evans because it received the benefit for the remaining term.

---

[50] Case no. 06-10370, pleading 502.

[51] Joint Stipulations, exhibit G, ¶ ix.

14

The parties agree that the Lexington Policy was an executory contract.[52] Under the terms of Evans' Plan, the only executory contracts assumed by Evans were those listed on Exhibit 2.[53] The Lexington Policy was not listed, and under the Plan's terms, was rejected.

> [A] rejection has an important but appropriately narrow function: it relieves the estate and nondebtor parties from future performance obligations and, by accomplishing a breach, it triggers a dischargeable, unsecured, prepetition claim against the estate.[54]

As a result, as of the Confirmation date, the policy was not an asset of Evans subject to transfer under the APA nor the Confirmation Order which approved it.[55] Because the Lexington Policy was rejected, and was not an Acquired Asset, the unearned premium of $120,159.72 is owed to Evans.

However, Evans has failed to establish that Greif owes any responsibility to refund the premium. The Lexington Policy was a contract between Lexington and Evans. No privity of contract existed with Greif on the contract. Thus, Lexington is the party with alleged obligations to Evans, not Greif. For this reason, Evans' demand against Greif for return of the unearned premium under the Lexington Policy is denied.

## IV. CONCLUSION

---

[52] Greif's Trial Brief, pleading 22, p. 41 and Evan's Reply Trial Brief, pleading 32, p. 21.

[53] The Plan provides that only the executory contracts listed on Exhibit 2 to the Plan were assumed. The Lexington Policy was not listed. The Plan provides that except as set forth in the APA or expressly listed, "[a]ny and all other executory contracts and unexpired leases to which the Debtor is a party shall be deemed to have been rejected by the Debtor as of the Confirmation Date; ..." Case no. 06-10370, pleading 502, exhibit 1, section 8.1.

[54] *In re CVA General Contractors, Inc.*, 267 B.R. 773, 777 (Bankr.W.D.Tex. 2001); *citing In re Austin Development Co.*, 19 F.3d 1077 (5th cir. 1994).

[55] The Court notes that Evans would have had to assume the Lexington Policy before assigning it to Greif. 11 U.S.C. § 365(f)(2).

15

The $649,633.75 Holdback for Environmental Claims, and the $10,452.06 Holdback for payments made by Greif to Ingersoll-Rand are denied. Trustee's $97,224.12 setoff claim against Greif for prepaid insurance premiums is also denied. Greif has acquiesced to a $5,238.09 obligation representing utility deposits posted by Evans but refunded to Greif. Therefore, Greif shall pay $5,238.09 to Evans, and Greif shall release to Evans the Holdback of $649,633.75 and $10,452.06 plus all accrued interest on same.

A judgment will be rendered in accordance with these reasons.

New Orleans, Louisiana, March 26, 2009.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge